## Watson *against* Gregg.

If after a conveyance in fee, the grantor enters into the land, and acts in all respects as the owner of the inheritance, making leases, receiving rents, paying taxes and improving the property, and dying seised, his entry must be taken to be adverse.

If after the death of such grantor, leaving children, his son enters as one of the heirs, his entry and possession are the entry and possession of the other heirs, and enure to their benefit, whether it be to prevent the statute of limitations running against them in his favour, or to gain a title thereby.

An ouster of the other heirs by him who enters on real estate, can only be by some clear, positive and unequivocal act, amounting to an open denial of their right, and putting them out of the seisin.

The mere declaration by one thus entering, " that the land did not belong to his father's estate, that his father had sold it at an early date, and he did not know when the owner or his representatives might come for the property, and whenever they came it was theirs—or that he did not know whether it was his, that his father had mortgaged it, and on these accounts he refused to allow a tenant to improve it," without any evidence of attornment to such third person, or intercourse with or knowledge of him, does not, although the deed to such third person be produced, constitute an ouster of the other heirs.

Where the defendant sets up an outstanding title in certain persons as heirs of the grantee, a deed from these persons calling themselves heirs, is not evidence, unless there be proof that they are such.

A VERDICT and judgment were rendered in favour of the plaintiff below, Sidney Gregg, a lunatic, who sued by her committee, against the defendants below, Aaron Watson and Charles S. Bradford, Esq., (admitted as co-defendants,) for one-third of the premises claimed in ejectment brought to recover 370 acres of land, in St. Clair township, Allegheny county. The plaintiff claimed as daughter, and one of the heirs of John Ormsby, deceased, who obtained a patent for the land in April 1788. In June 1788, he executed a deed for it to Wm Lamb and John W. Checkly, which was recorded in Allegheny county on the 11th December 1788. The defendant Watson went into possession under Oliver Ormsby, one of the children of John Ormsby, deceased, and set up title under him. The defendant Bradford gave in evidence a deed from the heirs of Checkly to him, dated August 31, 1839, and letter in June 1839, from the heirs of Oliver Ormsby, agreeing he should purchase from Lamb and Checkly for his own use, and releasing him from any restriction which the law might impose on him from purchasing for his own benefit, and agreeing not to hold the land adversely to him. He also offered in evidence powers of attorney from John S. Maginnis and wife, and others, stated to be heirs at law from Lamb, and a deed from the attorney to Charles S. Bradford, dated August 31, 1839, which were objected to, because there

X.—Z*

[Watson v. Gregg.]

was no proof that the persons assuming to be heirs of Lamb were such. The court rejected these papers and sealed an exception.

It further appeared in evidence, that John Ormsby went into possession in 1790 or 1791, claiming it as his own: that in 1790, he returned it to the assessor as his: that in 1791, he had tenants in possession of the property, and till the time of his death in December 1805, when he died, leaving children, Oliver Ormsby and the plaintiff, and a granddaughter, Mrs. Swazey. During his lifetime John Ormsby leased it to different tenants, received the rents, and acted in every respect as the owner, and it was assessed as his. After his death, the lessee continued to hold, until the year 1814, under Oliver Ormsby, who received the rents, and acted as owner, and afterwards rented it to others. Oliver was administrator of his father, and it was proved that he charged the taxes on this tract to the heirs of his father, and also charged them with moneys paid to the tenant for farm expenses, &c., in 1806, 1807 and 1811; that he had it assessed as his father's up to 1820, and afterwards in his own name. The defendant proved that Oliver was heard to say a number of times (some as early as 1812) that the place did not belong to his father's estate. In November 1829, he told a witness it was not worth his while to plant apple trees on it, for it did not belong to him, nor to his father's estate: his father sold it at an early date, and he did not know what day the owners, or some of their representatives might come for the property, and whenever they came it was theirs. He did not build on or take care of it as he did of his other land. To another witness he said in 1820 or 1821, that his father had sold the place some long time before that, and the men had never been heard of, and it was probable their heirs might come on, and he would not put any improvements on it till he saw whether they would come on, or something to that amount. The place was out of order. To another witness who was his tenant, he said in 1827, or after, that he would not allow him to make improvements, because his father had mortgaged it at an early day, and he did not know when the proper owner would come to claim it. On being asked why he did not pay off the mortgage and get the land in his possession, he said it was to a Scotchman, and he went back to his own country, and he had not heard from him for 16 years; that he did not know the day the heirs might come, and he was not certain whether it ever would be his or not, and therefore he thought it not necessary to improve it anything more than he could help.

The defendants further showed the record of an ejectment in the district court of Allegheny county, to July term 1835, by Gabriel Swazey and wife against George Barkhammer, (the tenant of Oliver on this land,) tried by jury August 20th, 1838, and verdict for plaintiff for 6 cents damages and 6 cents costs, and that the plaintiffs had conveyed their title since the ejectment was brought: on which judgment was entered for costs and nominal damages. It was admit-

ted that the heirs of Oliver Ormsby defended this suit: that John Ormsby, brother of Oliver, died before 1800, and his daughter and sole heir, Mrs Swazey, was born in Mississippi, and had resided there since: that the deed to Lamb and Checkly was not given in evidence in the above case, the counsel privately stating as their reason that it would cut both titles up.

The plaintiffs then proved that Mrs Gregg became insane in 1815, two years after her husband died. That in 1807 or 1808, Oliver Ormsby had the land surveyed; he thought Boggs was cutting timber on it and had it surveyed to find out. He ran the division line of the tract. And that in 1832, Oliver Ormsby included this tract in a list of his property.

The court below delivered the following charge to the jury.

*Grier*, president.—" The plaintiff, in this case, claims the undivided third part of the tract of land in dispute, as one of the heirs of John Ormsby, Sen. deceased.

" John Ormsby, Sen., obtained a patent for this land in April 1788. In June 1788, he executed a deed for this tract to Wm Lamb and John Webb Checkly. This deed was put on record; but from that day, for upwards of fifty years, neither of these grantees, nor any person claiming under them, or through this deed, have been known to lay any claim to this land. Nor, most probably, would the heirs of the grantees been hunted up, or any claim set up under them now, had not disputes arisen among the heirs of John Ormsby.

" Why these grantees have never, for so long a time, laid any claim to the land, or why John Ormsby, after having sold this land, should, within two or three years after, enter upon it, and take possession of it, and use it as his own till the time of his death, we are left wholly to conjecture, as the testimony furnishes us no clue. We must, therefore, form our conclusion as to the rights of these parties, from the evidence before us, by applying to the facts the principles of law which govern the titles to real estate.

" It appears then, that John Ormsby, Sen., went into possession of this tract of land, claiming it as his own, as early as 1790 or 1791; for in 1790 it was returned by him to the assessor as his; and in 1791 he put two tenants on the tract, and continued to receive the rents and pay the taxes for the whole tract, as his, up to the time of his death in 1805. There is no evidence that he acted as agent for Lamb and Checkly, or treated the land as theirs. On the contrary, it appears he leased it as his own, received the rents for himself, returned it to the assessor as his property, and not as theirs; and as it was taxed to him personally as seated land, and was in possession of his tenants, who raised grain on it, and had personal property on it, the fair presumption is that he paid the taxes.

" When he died, his son, Oliver Ormsby, administered on his estate; and though the administrator, as such, has no right to receive the rents of the real property which descends to the heirs, yet it is very frequently the case that, when the heirs are scattered

[Watson v. Gregg.]'

abroad, the administrator takes care of the real estate, and receives the rents from the tenants; and as trustee for the other heirs either applies the rents to the payment of the debts of the estate, or accounts for them to the heirs: so in this case, Oliver Ormsby continued to receive the rents, kept an account in his books of them as received for the estate; charged the estate with the taxes, &c., paid; had the land assessed as the estate of John Ormsby up to 1820; after which it was assessed in his own name, till the time of his death in 1832.

"His co-heirs were his sister, the plaintiff, who was a widow, and became insane in 1814 or 1815, and has continued so ever since; and a daughter of his deceased brother, John, who at the time of their common ancestor's death was an infant in the state of Mississippi, and afterwards married and continued to reside there of late years. Mrs Swazey, the daughter of John Ormsby, Jun., and one of the heirs of John Ormsby, Sen., has been making some endeavors to recover her share of her father's estate from the heirs of Oliver Ormsby; and the children of Sidney Gregg having come to years of maturity, have been urging her claims. And since the institution of this suit, within the present year, Mr Bradford, the administrator of Oliver Ormsby, (and who as such, and as trustee for the heirs of Oliver Ormsby, has leased this property to the defendant, Watson,) has sought out the heirs of Lamb and Checkly, and obtained a deed from some of them (at least) apparently for his own use, with the leave of the heirs of Oliver Ormsby, who consent to give him up the possession.

" Without at all pretending to doubt the perfect correctness of Mr Bradford's intentions in this matter, it must strike every one as a most astonishing piece of self-denial, and excessive and romantic honesty in the heirs of Oliver Ormsby, to give up their claim to a tract of land worth 100,000 dollars, which has been in the exclusive possession of their father and grandfather for the space of fifty years, and allow Mr Bradford to search out the heirs of Lamb and Checkly, and exhumate this dead and buried claim for his own use, and not for theirs. Such instances of disinterested benevolence do sometimes occur in the world, but it is so seldom that we are slow to believe in them. Possibly this phenomenon in morals may be accounted for by supposing the parties acquainted with a certain principle of equity, viz: If one tenant in common, in possession, buys up an outstanding title, it shall enure to the benefit of his co-tenants. And if the Lamb and Checkly title can be revived, and hold the land for Mr Bradford, against all the heirs of old John Ormsby, it is possible that he (Mr B.) could afford to dispose of the land to the heirs of Oliver Ormsby for one-third of what it would cost them to buy out the co-tenants, their aunt and cousin.

" But the question to be decided is, whether the heirs of John Ormsby had not obtained a good title to this land by the statute of limitations, as against all the world? If so, the delivery of the pos-

[Watson v. Gregg.]

session to Mr Bradford, and his purchase of the Lamb and Checkly title, will not bar the plaintiff's recovery.

"The possession required by the statute of limitations, to bar the owner after twenty-one years, 'must be actual, continued, visible, notorious, distinct and hostile.' That the possession of John Ormsby and his family has all these qualifications, except the last, has not been disputed. The putting tenants on a tract of land, returning the whole tract to the assessor as one's own, the receiving the rents, cutting the timber, surveying the lines, &c., and continuing this without any abandonment or intermission for forty or fifty years, are unequivocal acts of claim and ownership, which afford the best evidence of ouster.

"It is not necessary that plaintiff should show that John Ormsby entered under some deed or written title, good or bad, in order to give color of title. M'Call *v.* Neely, 3 *Watts* 72; Criswell *v.* Altemus, 7 *Watts* 566.

"The fact that two or three years before Ormsby took possession, he had made a deed of the land to Lamb and Checkly, will not make him a trustee; nor does any presumption necessarily arise therefrom that he entered under them, more than if any other person had done it. It was not his business or duty to enter and keep the possession for them; he was in no relation to them that implied any future confidence or trust. We have no evidence, either from his acts or declarations, that he entered as their agent, trustee, or tenant: he returned the land as his own, not as theirs, to the assessor: the tract was called by his name, not theirs: he put on tenants, and received the rents for himself, not for them: he used the timber in improving his other land.

"It is true, that the question whether the entry of Ormsby was intended as an ouster of the persons owning the legal title; whether he entered as a disseisor or not, is a fact for the jury. But the jury have no right to conjecture an intent contrary to the notorious acts and conduct of the party. Piper *v.* Lodge, 16 *Serg. & Rawle* 233. Every thing said by the supreme court in that case, (see also same case, 4 *Serg. & Rawle* 310, 569,) as applying to the conduct of Reuben Haines, will apply with even greater force to the conduct of John Ormsby in this case.

"'A disseisor is presumed to have entered for himself till the contrary appears. And it is not essential to the claim of adverse possession that it be by claim of right in the occupant.' Parker *v.* Southwick, 6 *Watts* 377.

"But it is contended, that the declarations of Oliver Ormsby after his father's death, (in 1807 and afterwards,) 'that his father's title was not good, or that he had no title, that he had sold the land in his lifetime, or mortgaged it, and that he (Oliver) was afraid to make improvements, for fear that the heirs of the vendee might turn him out,' &c., in connection with the deed of John Ormsby, given in evidence, are sufficient to show that John Ormsby did not enter nor

claim adversely; or that if he had entered and held adversely, yet, as he died before the statute of limitations had made his title good, and his son and administrator who succeeded him in the possession disclaimed the title, and recognised that of Lamb and Checkly, that therefore the heirs gained no title by the statute of limitations.

" But the court are not of this opinion.   The declarations of O. Ormsby, even if they did amount to disclaimer, could have no retro-spective effect, so as to alter the nature of his father's entry, if it was originally tortious and adverse.   The testimony shows that John Ormsby had held the land in his own name, paying taxes and re-ceiving rents for fourteen or fifteen years before his death.   The lease he gave the tenant (Sangree) did not expire till 1808, three years after his death.   Although, at the time of his death, he had not a good title to the land, yet his possession and inchoate title, gained by disseisin, descended to his heirs.   It is clearly in evidence that Oliver entered as heir and administrator of his father, not as agent or tenant of Lamb and Checkly, in behalf of himself and his co-tenants: he received the rents from the tenants put on by his father; he returned the land to the assessors as his father's estate: he credited the rents in his books to his father's estate, and charged it with the expenses and taxes.

"Now even admiting that his declarations could be received to affect the title of his co-tenants, what do they amount to?  Not that his father or himself held under Lamb and Checkly, but simply that his father's title was not a good one.   When he first made that ad-mission, in 1807, it was true; the admission that his father had sold or mortgaged the land was true: his fear to put valuable improve-ments on the land was very natural; but they do not at all amount to an admission that his father did not enter a disseisor, or that he held under the good title of Lamb and Checkly.   The statute will run in favour of the heirs if they continue the possession, receive the rents, and pay the taxes, although they may know and admit there is a better title to the land, and be afraid of it appearing against them one day.   It is a bad title that is protected by the statute: a good one does not need it: and though the disseisor and his heirs may be conscious of the insecurity of their possession, the statute helps them nevertheless.

" The declaration said to be made in 1829, (twenty years after the title had become vested in the heirs by the statute,) even if you believe such words were used (as that ' whenever the heirs came, it was theirs') by O. Ormsby, cannot affect the title of his co-ten-ants.   He could surrender his own rights, but not those of others. And although I very much suspect that those words are an addition furnished more by the imagination than the recollection of the wit-ness, one acquainted with the whole history of this estate, and the claims of the newly-discovered heir in Mississippi, which began to be used about that time, might be led to suspect other reasons for

[Watson v. Gregg.]

this apparent candour and honesty with regard to the claim which had then slept forty years, than appears on the surface.

" On the whole, the court would say, that although the question of adverse possession is one of fact, and therefore to be decided by the jury, yet that they see nothing in the evidence, admitting it all to be true, which should hinder you from giving a verdict for the plaintiff. On the contrary, the court would say, if you believe all the testimony in the case, (and there is no contradiction in it,) your verdict should be for the plaintiff.

" This will render it unnecessary for me to give you a particular answer to each of the points made by defendant's counsel. I believe a substantial answer to them will be found in what I have already said, and if it will be of any benefit to him in the review of the case in the supreme court, he may consider them answered in the negative, so far as they properly apply to the case."

The defendant's counsel excepted to this charge, and a bill of exceptions was sealed.

The errors assigned were, the rejection of evidence in the bill of exceptions: the charge of the court saying that, " The authority by the heirs of Ormsby to purchase, was only to evade a principle of law respecting co tenants, being inhibited from purchasing an outstanding title.

" That the declarations of Oliver Ormsby were not evidence of the nature of his father's possession or of his own.

" That the testimony furnished no clue to the nature of that possession.

" That his possession enured to the benefit of the plaintiff.

" That if the jury believed all the evidence, there was nothing to prevent them from finding for the plaintiff.

*Dunlop,* for plaintiff in error.
*M'Candless,* for defendant in error.

The opinion of the court was delivered by

SERGEANT, J.—The principal error relied on in this case, is in the charge of the court, but we think the complaint of the defendant is without foundation. The entry of John Ormsby must be taken to have been adverse to the title of Lamb and Checkly, in the absence of any sort of evidence that he entered for them, or held under them. He acted, in all respects, as the sole owner and claimant of the inheritance, making leases, receiving rents, paying taxes, and preserving and improving the property. He had no title or colour of title that we know of. He was merely a trespasser, but such an occupant as by our law gains a complete title by disseisin, after an uninterrupted enjoyment for twenty-one years. Pipher *v.* Lodge, 4 *Serg. & Rawle* 310, and 16 *Serg. & Rawle* 214. On his death, his son, Oliver Ormsby, entered and held, not in his own right, but *jure representationis,* as one of the sons and

heirs of his father, and as tenant in common with the other heirs. By so doing he preserved the claim or initial title, such as it was, of the whole of the heirs, and as much for their benefit as for his own. For it has long been a settled principle, that the entry and possession of one coparcener, joint-tenant or tenant in common into lands, is the entry and possession of the others, whether it be on the one hand, to prevent the statute of limitations running against them in his favour, or on the other, to preserve and perpetuate their rights as possessors, and to gain a title thereby. The heir who enters is considered as doing so for himself, as regards his own right, and as trustee for the others, and accountable to them for their portion of the rents and profits received by him, during the time he so holds the lands. It is in consequence of this sort of fiduciary relation in which he is placed, as to the others, that he is not ordinarily allowed to claim for himself an interest opposite to that of the others, but his acts are treated as theirs, and for their common benefit. He may, it is true, oust the other heirs, and gain the title for himself; but this must be by some clear, positive, and unequivocal act, amounting to an open denial of their right, and putting them out of the seisin. Such ouster will not be presumed merely from his taking the rents and profits, (unless after a lapse of a very great length of time,) but must be proved by decisive acts of a hostile character. Lodge *v.* Patterson, 3 *Watts* 96; Ford *v.* Gray, 1 *Salk.* 285; Smales *v.* Dale, *Hob.* 120; Fisher *v.* Prossar, *Cowp.* 218; Fairclaim *v.* Shackleton, 2 *W. Bl.* 2620; *Burr.* 2604; *Co. Lit.* 242, *a. b.*; 1 *East* 568.

It cannot be pretended here, that Oliver Ormsby ever thus ousted the other heirs. On the contrary, he recognized his duty to them by holding the possession, taking care of it, receiving the rents, making leases, paying taxes, and other expenses, and charging the estate in his accounts with their proportion of his disbursements. It would require much stronger facts than any here shown, to establish, that he at any time divested the rights of the other heirs, and to enable him to claim the whole for himself, or to admit an outstanding title in a third person as against them. There is nothing to warrant the idea, that he ousted the other heirs; and as to the title of Lamb and Checkly, he never yielded up the possession to them, or attorned to them as their tenant, or had any intercourse or communication with them, nor had he, or any of the other heirs, any knowledge of them. All that is shown is, that at different times, he stated to these persons, that there was an outstanding title of some kind, which might, at a future day, be asserted for the land. This could not affect the possession taken and held by his father, John Ormsby, and cast upon his children by descent, which Oliver continued and carried on by his possession: and in fact, in legal operation as against their rights, amounted to nothing. The court was, we think, right in saying, that the statute would run in favour of the heirs, if Oliver Ormsby continued the possession, re-

[Watson v. Gregg.]

ceived the rents, and paid the taxes, though he knew and admitted that there was a better title to the land, and expressed his belief of its appearing one day.

In regard to the bill of exceptions, we see no error in the rejection of the depositions by the court. The question was not of identity, that is, whether the persons now suing are the same as those who executed the powers of attorney: but whether certain persons claiming as heirs, and executing conveyances to the defendant, on which he sets up a title, must not be proved by evidence of some sort or other, to be such heirs, before the conveyances can be read: and it is clear they must.

Judgment affirmed.